UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 07-CR-0037-CVE |
| ) | |
| DUSTIN ROBERT EASTOM, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Now before the Court is Defendant's Motion to Suppress Evidence With Brief (Dkt. # 15). Defendant argues that police searched his house without a warrant or without voluntary consent from a resident authorized to consent to the search. Defendant also requests that the Court suppress any statement made by defendant or his girlfriend to the police during or after the search.

**I.**

On January 25, 2007, police received an anonymous tip that drugs were being sold from 1337 North Irvington Avenue in Tulsa, Oklahoma, and the source identified Dustin Eastom ("Eastom") as the seller. Tulsa Police Officer Leland Ashley ("Ashley") initially investigated the tip and found that Eastom had a prior arrest[1] for selling a controlled substance. Eastom was also believed to be a member of the I Block Piru Bloods Gang. Police conducted surveillance at Eastom's home on February 8, 2007 around 11:30 a.m. Tulsa Police Officer Sean Hickey ("Hickey") and Ashley observed the home for 45 minutes. They noticed that the front door was

---

[1]  Ashley performed a search using the Tulsa Regional Automated Criminal Information System ("TRACIS") to investigate Eastom's criminal history. Eastom had been arrested for allegedly selling narcotics, but TRACIS did not show that Eastom had been convicted of that charge.

open but the glass storm door was closed. During the 45 minutes of surveillance, no one entered or left the home.

Ashley called Tulsa Police Officers Jeff Henderson ("Henderson") and Frank Khalil ("Khalil") to assist with a "knock and talk" at the residence. The government describes a "knock and talk" as an investigative technique used at the home of a suspect, which is a consensual encounter between police and a possible suspect. Khalil and Henderson arrived at Eastom's residence with Alcohol, Tobacco, Firearms and Explosives Special Agent Brandon McFadden ("McFadden"). Ashley went to the door with Hickey and Henderson[2] and knocked. A female, Ladonna Wynn ("Wynn"), came to the door. Officer Ashley showed Wynn his badge[3] and told her about all of the police officers present at the residence. He stated that police had reason to believe that Eastom was selling drugs from the residence. Wynn told Ashley that Eastom was her boyfriend, but she did not know anything about possible drug sales from the residence.

Ashley asked Wynn if any illegal drugs or guns were in the house, and Wynn denied that there were any drugs or guns. Ashley asked if he could look around, and he testified that Wynn permitted him to enter the house, along with Hickey and Henderson. He believed that, based on her statements that she lived in the residence, Wynn had authority to permit them to enter the house. Almost immediately after entering the house, Ashley saw a small amount of marijuana sitting on an entertainment console or television stand. Ashley testified that Wynn appeared to notice that he saw

---

[2] Ashley testified that Hickey and Henderson went to the door with him when he initiated the encounter, and that Khalil and McFadden went to the back of the house to prevent the occupants from escaping. All of the law enforcement officers present were in plain clothes.

[3] On cross-examination of Ashley, defense counsel implied that Ashley may not have shown his badge to Wynn. Ashley testified that he was "certain" he showed his badge and properly identified himself at the inception of the encounter.

2

the marijuana, and Wynn stated "that's not mine" without any questioning from Ashley. At this point, Wynn told Ashley that she did not own the house and she did not know if there were any more drugs. Wynn stated that she lived at the house with Eastom and Eastom's two-year old daughter, Selicity Eastom. Selicity Eastom was present at the home during this encounter.

Khalil and McFadden subsequently entered the house and the police expanded their search. Police found more marijuana, a crystal-like substance later identified as methamphetamine, and several guns.[4] Henderson testified that the methamphetamine was found in a small metal box approximately the size of two decks of cards. The metal box was latched but it was not locked. Two guns were found in a duffel bag in the central bedroom. The duffel bag was partially in the bedroom closet, but Henderson testified that duffel bag was sticking out of the closet. The government provides the following list of items seized during the search:

- one pill bottle containing a plastic baggie with 5.78 grams of methamphetamine
- one Taurus .44 caliber magnum revolver, serial number PH430880
- two functioning digital scales taken from middle bedroom
- one Charter model 2000 .22 caliber revolver, serial number 45809
- one baggie of marijuana taken from night stand
- one Sig Sauer, model P230 9mm semi-automatic handgun
- one pill bottle containing a small amount of marijuana
- one pill bottle containing a variety of pills
- large digital scales taken from kitchen
- one box containing 10 rounds of Blazer 9mm ammunition
- one box containing 50 rounds of Zero .40 caliber ammunition
- one box containing 50 rounds of Winchester .44 caliber magnum ammunition
- 50 round of Winchester .40 caliber ammunition taken from both bedrooms

---

[4] The testimony of Ashley, Henderson and McFadden established that Henderson, Hickey, and McFadden participated in the search. Khalil stayed with Selicity Eastom and Ashley remained with Wynn during the search.

Dkt. # 19, at 5. The seized items were brought into the living room. While the police were gathering seized contraband, Ashley asked Wynn if she would fill out a witness statement. Wynn agreed to complete a witness statement stating that she knew that there was marijuana in the house and that she had smoked "ice" or methamphetamine with Eastom.[5] In her statement, she denied any knowledge that Eastom was selling drugs from the house. The government states that "the officer [sic] were noncoercive, their tones were conversational and no guns were displayed" during the search, and the government denies defendant's allegation that Wynn's consent was not voluntary. Id. at 3. Ashley testified that Wynn repeatedly denied ownership of the residence during the search or that she knew anything about drug sales.

As police were preparing to leave, Eastom entered the residence. The police officers drew their weapons and placed Eastom on the floor. He was handcuffed and frisked for officer safety. According to Ashley, he explained the purpose of the police officers' presence and Eastom immediately stated that he would voluntarily provide information if he did not have to go to jail. Ashley advised Eastom that he could complete a confidential informant form, but Ashley did not have a form with him. Eastom stated that he wanted to serve as a confidential informant, that he knew of a "high-level drug dealer" who sold large amounts of crystal methamphetamine, and he mentioned a name. Ashley was not familiar with the name mentioned by Eastom, but other police officers recognized the name as a known drug dealer. Ashley asked Eastom if he would accompany Ashley to the police station to complete a witness form. Eastom agreed, and he drove his own vehicle to the police station. Once Ashley and Eastom arrived at the police station, Ashley asked

---

[5] Wynn testified that she began smoking methamphetamine when she was 14 or 15 years old. However, she could not recall how often she has smoked methamphetamine and she believes she may have smoked methamphetamine one or two times.

Eastom to read and sign a notification of rights waiver. Eastom said that he understood his rights, but Ashley made him read the form before signing the waiver. Ashley claims that Eastom waived the right to an attorney before writing a witness statement. In the witness statement, Eastom acknowledged that the drugs belonged to him, not his girlfriend. He also stated that a woman named Tiara Henry brought several of the guns to his house, and the only gun that belonged to him was a Sig 9mm automatic handgun. After completing the witness statement, Ashley gave Eastom his phone number and let Eastom drive home. Eastom was not arrested after writing his witness statement.

At the suppression hearing, Wynn and Eastom testified and presented a different version of the events of February 8, 2007. Wynn stated that Ashley and McFadden approached the front door, but Henderson was not with them at that time. According to Wynn, Ashley identified himself as "L.A." but McFadden did not identify himself at all. Ashley told Wynn that he received a tip that Eastom was selling marijuana or "weed" from the house. She denied knowledge of any drug sales and, after a brief conversation, she claims that Ashley and McFadden were going to leave. Before leaving, Ashley asked Wynn if she would take his card to give to Eastom and, as Wynn opened the door to take Ashley's card, Ashley stuck his foot in the door and pushed past Wynn into the house. She denies that Ashley ever asked for permission to enter the house. Wynn also testified that she asked to see a search warrant. Ashley allegedly told Wynn that he had a warrant, but he never produced a copy of the warrant for her inspection. She also stated that Ashley asked for consent and she denied his request.

Wynn claims that Ashley threatened to arrest her and place Eastom's child into protective custody if she did not cooperate. Wynn acknowledged that she did not see any firearms, but she

claims that Ashley showed her handcuffs and threatened to use them if she did not consent to a search. She states that the search lasted for about 45 minutes to an hour. She remembers talking to Ashley, but she does not remember speaking to any other police officer.[6] At the hearing, defense counsel asked Wynn to review a copy of her witness statement signed on February 8, 2007. She claims that Ashley forced her to write the statement and she was frightened that Ashley would arrest her if she did not comply. She testified that Eastom entered the house after she wrote the statement. She recalls that police threw Eastom to the ground, and every police officer present had his gun drawn. Eastom and Wynn testified that Eastom asked Wynn to call his mother and his attorney, but police would not let Wynn use the telephone. Eastom denies that he offered to serve as a confidential informant, and he claims that police officers questioned him about other drug dealers. Eastom testified that he was permitted to drive to police station in his own car, and he followed Ashley voluntarily. Eastom claims that Ashley dictated a witness statement to him.

Eastom called Debbra J. Gottschalk ("Gottschalk"), an attorney, as a witness at the suppression hearing. Gottschalk testified that Eastom called her on February 9, 2007, to discuss the police search of the previous day. She advised defendant not to talk to Ashley or any other police officer, and she called Ashley to inform him that all further communications about this matter should be directed to her. She testified that Eastom claimed police seized several envelopes full of money from Eastom's house, but the money allegedly belonged to Eastom's mother. Gottschalk testified

---

[6] At the suppression hearing, Henderson testified that he also talked to Wynn during the search of the house.

that Eastom and Wynn came to her office on February 13, 2007[7] to discuss the case and review affidavits prepared by Gottschalk.[8]  The affidavits were signed on February 14, 2007.

At the suppression hearing, defendant produced a black box resembling a safe.  The box was made out of steel and had a lock.  Defendant testified that the box had pry marks and it appeared that someone tried to force the box open.  He stated that the pry marks were not present the morning of February 8, 2007, and he noticed the pry marks for the first time the evening of February 8, 2007.  Henderson and McFadden testified that they had never seen the box, and they did not pry the box open during the search.

## II.

The government argues that the search of the house was proper, because Wynn voluntarily consented to the search.  The government asserts that Wynn had actual authority or apparent authority to consent to the search, and police could rely on Wynn's consent to search the home.  Defendant responds that police never asked for consent or, if the Court finds that the police asked for consent, Wynn did not voluntarily consent to the search.  Defendant suggests that Wynn may have been intimidated by the presence of five police officers, and he alleges that police engaged in

---

[7] Wynn testified that she and Eastom went to Gottschalk's office on February 9, 2007 to sign the affidavits.

[8] Defendant offered Wynn's affidavit as an exhibit at the suppression hearing.  It was initially excluded as not relevant because, even if the affidavit contradicted the government's version of events, it would not assist the Court in determining what actually happened on February 8, 2007 because the Court assumes the substance of the affidavit is consistent with Wynn's testimony at the suppression hearing.  After defendant renewed his request to admit the affidavit, the Court offered to admit it.  However, defendant agreed that Wynn's affidavit was consistent with her testimony at the suppression hearing, and he withdrew his request to admit it.

coercive conduct to obtain consent. He also argues that Wynn lacked authority to consent to a search of the duffel bag and small metal box, because these items belonged solely to defendant.

**A.**

The Fourth Amendment ordinarily prohibits the warrantless search of a person's home as per se unreasonable. Georgia v. Randolph, 547 U.S. 103, 106 (2006); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Police face a higher burden when entering a person's home, because "[f]reedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." Payton v. New York, 445 U.S. 573, 587 (1980). Police can enter a person's home with consent, even if probable cause does not exist, provided that the consent is "freely and voluntarily" given. United States v. Cruz-Mendez, 467 F.3d 1260, 1265 (10th Cir. 2006). A court must review the totality of the circumstances to determine if consent was voluntary. United States v. Santurio, 29 F.3d 550, 552 (10th Cir. 1994). The Tenth Circuit has articulated a two-part test to determine if consent is voluntary:

> First, the government must proffer "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given." Furthermore, the government must prove that this consent was given without implied or express duress or coercion.

United States v. Angulo-Fernandez, 53 F.3d 1177, 1180 (10th Cir. 1995). The mere fact that police approached defendant's house to initiate the encounter does not create an inference that Wynn's consent was obtained through coercion. United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005). The Tenth Circuit has identified a list of non-exclusive factors that are often relevant to determine if consent was voluntary:

> the location of the encounter, particularly whether the defendant is "in an open public place where he [is] within the view of persons other than law enforcement officers;" whether the officers "touch or physically restrain" the defendant; whether the

>officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officer's retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically "advised defendant at any time that he had the right to terminate the encounter or refuse consent."

United States v. Zapata, 997 F.2d 751, 756-57 (10th Cir. 1993) (internal citations omitted).

The government states that police did not draw their weapons before, during, or after the search, and that Ashley's request for consent was a request, not a demand. Ashley denies that he threatened to call the Oklahoma Department of Human Services ("DHS") to take Selicity Eastom into state custody or that he showed Wynn handcuffs and threatened to arrest her. Defendant suggests that Court should credit Wynn's testimony over Ashley's testimony. He argues that Wynn would not have voluntarily allowed police into the house if she knew that drugs were in plain view. Even assuming that Ashley's testimony were true, he claims that there is no evidence that Wynn consented to a search of the house and the scope of the consent was ambiguous. He also argues that Wynn may have been intimidated by the presence of five police officers and her consent could not have been voluntary under the circumstances.

The Court finds that Wynn voluntarily consented to the search of the residence on February 8, 2007.[9] The testimony of Ashley, Henderson, and McFadden was consistent and the Court finds that their testimony about the events of February 8, 2007 was credible. It is significant that Ashley permitted defendant to drive to the police station in his own vehicle. According to defendant, he

---

[9] The Court notes the Supreme Court's ruling in Georgia v. Randolph, 547 U.S. 103 (2006), but finds that Randolph is inapplicable to this case. Randolph prevents police from conducting a consent search if one co-tenant consents to a search and another co-tenant, who is present, refuses to consent. Id. At 106. In this case, Eastom was not present at time police requested Wynn's consent to search the house, and Randolph is not implicated.

requested an attorney and was generally uncooperative with the law enforcement officers.[10] It is unlikely that police would have permitted Eastom to drive to the police station in his own car if defendant had been uncooperative.[11] McFadden testified that it is standard practice for police to allow a suspect to drive the police station if there is a "trust factor." The trust factor in this case was provided by defendant's willingness to provide information and cooperate with police, and this corroborates the police officers' testimony during the suppression hearing. This also undercuts the credibility of defendant's testimony that he did not cooperate with police.

Defendant argues that Wynn's testimony was credible and, even if the Court finds Ashley's testimony credible, Wynn's consent was obtained through coercion. However, the mere fact that marijuana was visible does not show that Ashley forcibly entered the house. Based on Ashley's testimony, it appears that Wynn may have forgotten about the marijuana until he noticed the marijuana in plain view, and Wynn immediately attempted to deny ownership of the drugs. Without more, the fact that police entered the house with drugs in plain view does not support the credibility of Wynn's testimony. Wynn's allegations that police threatened to notify the DHS and threatened to arrest her are not credible. Wynn has not made a formal complaint with the Tulsa Police

---

[10] The Court notes that the testimony of Gottschalk and Wynn differed as to when Eastom and Wynn met with Gottschalk and when the affidavits were signed. This detracts from the credibility of defendant's version of events. The Court also finds it significant that defendant did not call Gottschalk on the night of the search. A key aspect of Eastom's and Wynn's testimony is that Eastom wanted to talk to an attorney as soon as he was handcuffed. This suggests he would have contacted his attorney as soon as possible after the search if he had actually made a request to talk to his attorney during the search and, by implication, supports Ashley's and Henderson's testimony that defendant did not ask to speak to an attorney.

[11] Wynn testified that defendant was placed under arrest as soon as he entered the house. However, it is not clear why police would have permitted defendant to drive to the police station in his own car if he were under arrest.

10

Department, nor is there any indication that the state has investigated defendant or Wynn concerning the care of Selicity Eastom. Defendant's suggestion that Wynn was intimidated by the presence of five police officers is not credible and is not supported by the facts. At the suppression hearing, Wynn did not testify that the number of police officers present intimidated her or affected the voluntariness of her consent. According to Wynn, Ashley and McFadden were the only police officers to approach the front door when police initially entered the house. Although the Court does not find Wynn's testimony on this point reliable,[12] according to her version of events she would have initially encountered two police officers instead of five. Finally, Wynn testified that she is still defendant's girlfriend and still resides with him; thus, she has a personal interest in the outcome of this matter. In summary, the Court finds Wynn's testimony is not credible and there was no coercion.

In her witness statement, Wynn clearly stated that she "gave the officers the concent [sic] to serch [sic] the house." Plaintiff's Ex. 1, at 1. Based on Ashley's testimony, when Wynn permitted Ashley to enter the house, she did not limit the scope of her consent nor did she ever attempt to withdraw her consent. When Wynn stated she did not own the house, Ashley became concerned about the validity of Wynn's consent and, once inside, he asked Wynn again if she lived at the house and if she consented to a search. He testified that she answered each question affirmatively. Henderson also testified that Wynn voluntarily allowed Ashley to enter the house. The government has presented credible testimony showing that Wynn voluntarily consented to a search of the residence. Therefore, the Court finds that the police had voluntary consent to search

---

[12]  The Court finds reliable Ashley's testimony that he and two other officers approached the door. See footnote 2, supra.

defendant's residence and the evidence seized during the search will not be suppressed on the basis of involuntariness or coercion.

**B.**

Defendant raises the issue of Wynn's authority to consent to a search. Police can obtain consent from the owner of the property or a third party who has actual or apparent authority to consent to the search. United States v. Trotter, 483 F.3d 694 (10th Cir. 2007). To show that the third party had actual authority to consent to a search, "the government bears the burden of proving by a preponderance of the evidence that the consenter had mutual use of the property searched by virtue of her joint access to it, or control for most purposes over it." United States v. Rith, 164 F.3d 1323, 1329 (10th Cir. 1999). Mutual use is a fact-intensive inquiry that requires the court to find that the consenter had a right to access the premises at will. Id at 1329-30. On the other hand, the consenter's control over the property is "a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes." Id. at 1330. Apparent authority exists when, under the totality of the circumstances, "the facts available to the officers at the time they commenced the search would lead a reasonable officer to believe the third party had authority to consent to the search." United States v. Andrus, --- F.3d ---, 2007 WL 2405256, at *5 (10th Cir. Aug. 24, 2007).

The Court finds that Wynn had actual authority to consent to the search. Wynn had a free right of access to the house and she told police that she had lived at the house for "several months." Dkt. # 19, at 3. She denied ownership of the house only after Ashley found drugs in plain view but, at the time Officer Ashley entered the house, she told Ashley she lived at the residence. See United States v. Denberg, 212 F.3d 987 (7th Cir. 2000) (girlfriend had actual authority to consent when she

lived and received mail at the defendant's house); United States v. Goins, 437 F.3d 644, 649 (7th Cir. 2006) (police reasonably relied on the defendant's girlfriend's statement that she lived at the apartment when determining that girlfriend had actual authority to consent). Based on Wynn's relationship with defendant and the fact that she had lived at the house for several months, Wynn had actual authority to consent to the search. She testified that she lived at the house and cared for Selicity Eastom when defendant was not home. As a resident of the house, police could reasonably believe that Wynn had actual authority to consent to a search. United States v. Gillis, 358 F.3d 386, 391 (6th Cir. 2004). This shows that she exerted control over the house. Based on either mutual use or control, Wynn had actual authority to consent to the search.

In the alternative, the Court finds that Wynn also had apparent authority to consent to the search. The Supreme Court has stated that apparent authority is present when the facts available to a police officer would "'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises." Illinois v. Rodriguez, 497 U.S. 177, 188 (1990). When determining whether Wynn had apparent authority, the Court should give critical weight to evidence that Wynn lived at the residence. United States v. Hudson, 405 F.3d 425 (6th Cir. 2005). A reasonable police officer could have concluded that Wynn had authority over the premises and, based on actual or apparent authority, her consent was valid. Evidence seized from the house during the February 8, 2007 search will not be suppressed on the basis that Wynn lacked authority to consent to the search.

## C.

Defendant also raises the issue of the scope of Wynn's consent to search. At the suppression hearing, defendant argued that Wynn's consent could not extend to private containers belonging

13

solely to defendant. He cites <u>United States v. Salinas-Cano</u>, 959 F.2d 861 (10th Cir. 1992), and <u>United States v. Donnes</u>, 947 F.2d 1430 (10th Cir. 1991), to support his argument that Wynn's consent was insufficient to justify a search of a duffel bag and a small metal box, both of which contained drugs. Defendant also suggests that the pry marks on the black metal box indicate that police were searching personal containers belonging to defendant, even though Wynn did not have authority to consent to a search of defendant's personal items.

<u>Donnes</u> was not a consent case. In <u>Donnes</u>, the Tenth Circuit found that police exceeded the scope of the search by opening a camera lens case that was hidden inside a glove. <u>Donnes</u>, 947 F.2d at 1435. The glove was in plain view and the officer could seize the glove, but the police officer did not have probable cause to open the camera lens case. <u>Id</u>. <u>Salinas-Cano</u> was a consent case, but it is clearly distinguishable from the present case. In <u>Salinas-Cano</u>, the defendant frequently stayed at his girlfriend's apartment, and police conducted a consent search of the girlfriend's apartment. <u>Salinas-Cano</u>, 959 F.2d at 862. Police opened a suitcase belonging to Salinas-Cano, and the police had specific knowledge that the suitcase belonged to him. Even though the apartment belonged to the defendant's girlfriend, she lacked authority over the suitcase and the police were aware of this fact. <u>Id</u>. at 863-65 ("Ms. Garcia clearly stated, and the searching officer knew, that the suitcase belonged to defendant alone; there was no suggestion that Ms. Garcia had ever used or been permitted to use it.").

The cases cited by defendant do not show that defendant had a reasonable expectation of privacy in the duffel bag or the small metal box. Without some evidence that the small metal box and the duffel bag were the sole property of defendant <u>and</u> that police were aware of this fact, the Court will not suppress evidence found during the search as outside the scope of Wynn's consent.

Wynn's behavior indicated to police that she had joint ownership of the house and items within the house. She did not notify police that any specific property belonged solely to defendant and, as a resident of the house, she had authority to consent to a search of common rooms and items in plain view. See Frazier v. Cupp, 394 U.S. 731 (1969) (joint owner of duffel bag could consent to a search of the bag because both owners had right to use the property and objecting owner did not take sufficient care to conceal his private property); Donovan v. A.A. Beiro Const. Co., Inc., 746 F.2d 894 (D.C. Cir. 1984) (the "touchstone of . . . third party consent analysis is that any reasonable expectation of privacy in common areas is lost once joint occupants assume the risk that a co-occupant will allow access to the common areas"). There was no indication at the time of the search that the duffel bag or small metal box were defendant's personal property and these items were left in common areas. Therefore, defendant did not have a reasonable expectation in privacy that would have prevented Wynn from consenting to a search of these items, and this basis for suppression of evidence is denied.

**III.**

Defendant argues that the witness statements taken from him and Wynn[13] after the search were coerced. Defendant cites Haynes v. Washington, 373 U.S. 503 (1963), which is a case dealing

---

[13] Defendant does not have standing to challenge the voluntariness of Wynn's statement or whether police complied with Miranda when questioning Wynn. United States v. Nobles, 422 U.S. 225, 234 (1975) ("the Fifth Amendment privilege against compulsory self-incrimination, being personal to the defendant, does not extend to the testimony or statements of third parties called as witnesses at trial); United States v. Boruff, 870 F.2d 316, 319-20 (5th Cir. 1989) (defendant's Fourth and Fifth Amendment rights are personal and can not be used to exclude the testimony of witnesses).

with the admissibility of coerced confessions under the Due Process Clause.[14] The government addresses Miranda v. United States, 384 U.S. 436 (1966), in its response, and argues that defendant's volunteered statements are admissible under Miranda and the Due Process Clause. Although defendant does not expressly argue that police violated Miranda, defendant's arguments in his motion to suppress and at the suppression hearing implicate Miranda, and the Court will consider whether the police officers' conduct in this case violated Miranda or the Due Process Clause.

In Miranda, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Under this rule, the court must suppress a statement, even if voluntary, if a proper warning was not given before police initiated custodial interrogation of a suspect. United States v. Patane, 542 U.S. 630 (2004); United States v. McCurdy, 40 F.3d 1111, 1117 (10th Cir. 1994). However, the fruit of the poisonous tree rule does not apply even if defendant successfully proves that police obtained a statement through custodial interrogation without giving a Miranda warning. United States v. Pettigrew, 468 F.3d 626, 636 (10th Cir. 2006). The Miranda exclusionary rule requires only that the court exclude any "unwarned statement" itself. Oregon v. Elstad, 470 U.S. 298, 307 (1985).

---

[14] Defendant also cites Colorado v. Connelly, 479 U.S. 157 (1986), but this case does not help defendant. In fact, it directly supports the government's contention that defendant's unsolicited statements to police do not implicate the Due Process Clause at all. In Connelly, the defendant approached a police officer and, without any prompting, confessed to murder. Id. at 160. This did not implicate the Due Process Clause, because the government did not engage in any coercive activity. Id. at 166.

16

When defendant entered the house, police placed him in handcuffs for officer safety. The government states that police did not interrogate defendant, but defendant began talking without any prompting from police. Although police handcuffed defendant and he was arguably in custody, police did not need to give defendant a Miranda warning unless they intended to interrogate him. United States v. Gay, 774 F.2d 368 (10th Cir. 1985) (Miranda not implicated, even if a suspect is under arrest, unless defendant makes statements as a result of interrogation). Ashley told defendant why the police were in his house and, if defendant wanted to provide information, he could fill out a confidential informant form. However, Ashley asked defendant to follow him to the police station before making a statement. Once there, Ashley advised defendant of his Miranda rights, and defendant waived his Miranda rights before completing a witness statement.

The Court finds no evidence that police interrogated defendant before providing a proper warning at the police station. Wynn testified that she could not hear defendant's conversation with law enforcement officers, and she could not provide any details about the subject matter of that conversation. Ashley and Henderson both testified that defendant offered to serve as a confidential informant without any questioning. There is no evidence that police attempted to obtain a self-incriminatory statement from defendant until defendant completed a witness statement at the police station. The fact that defendant was permitted to drive to the police station in his own car corroborates the testimony of law enforcement officials, and suggests that defendant was willingly cooperating with police. The Court finds Ashley's and Henderson's testimony credible, and finds no indication that defendant was subjected to custodial interrogation. Assuming that defendant was in custody for purposes of Miranda, there is no evidence that police interrogated defendant while

he was in custody. Therefore, the Court will not suppress, based on Miranda, any statements made by defendant before he executed his witness statement.

Defendant also argues that police obtained a confession from him in violation of the Due Process Clause. The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from using any confession obtained by physical or mental coercion. Dickerson v. United States, 530 U.S. 428 (2000); Payne v. Arkansas, 356 U.S. 560 (1958); Brown v. Mississippi, 297 U.S. 278 (1936). The Supreme Court has adopted a totality-of-the-circumstances test to determine whether a confession was involuntarily obtained. Withrow v. Williams, 507 U.S. 680, 689 (1993); Arizona v. Fulminante, 499 U.S. 279, 285-86 (1991). The defendant must show that he agreed to confess after being subjected to inherently coercive interrogation techniques. Miller v. Fenton, 474 U.S. 104 (1985). In this case, there is no evidence that the government even interrogated defendant, let alone engaged in techniques that were so coercive that defendant's witness statement should be suppressed as involuntary under the Due Process Clause. Even if the Court were to credit defendant's version of events, defendant has not shown that police interrogated him, let alone that police engaged in conduct that was so inherently coercive that the Court should suppress any evidence in this case. Therefore, the Court denies suppression of defendant's witness statement or any other statement under the Due Process Clause.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence With Brief (Dkt. # 15) is **denied**.

**DATED** this 12th day of September, 2007.

_Claire V Eagan_
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT